IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **LEMUEL WRIGHT,** | : | |
| *Plaintiff*, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| **LINCOLN PROPERTY COMPANY,** | : | No. 15-3483 |
| *Defendant*. | : | |

# M E M O R A N D U M

PRATTER, J.                                                                                          JANUARY 27, 2017

Lemuel Wright initiated this action against Lincoln Property Company following Lincoln's revocation of an offer of employment. After extending a conditional offer of employment to Mr. Wright, Lincoln discovered through a background check that Mr. Wright's criminal history included two felony convictions and revoked its offer. Mr. Wright filed suit under the Fair Credit Reporting Act, 15 U.S.C. §§ 1681-1681(x) ("FCRA"), which requires employers using background checks to adhere to a specific set of procedures aimed at protecting applicants. Mr. Wright alleges that Lincoln violated the FCRA by failing to notify him of the first or second background checks upon which Lincoln relied to revoke its offer. Mr. Wright also alleges that Lincoln violated Pennsylvania's Criminal History Record Information Act, 18 Pa. C.S. § 9101 *et seq.* ("CHRIA") by using his criminal history in an improper manner.

Before the Court are cross-motions for summary judgment. Lincoln moved for summary judgment as to all of Mr. Wright's claims, as well as punitive damages, and Mr. Wright moved for summary judgment as to his FCRA claim. The Court will grant summary judgment for Lincoln with respect to Mr. Wright's CHRIA claim. It will deny summary judgment for both parties with respect to Mr. Wright's FCRA claim, and any punitive damages associated with the FCRA claim.

**I.   Background**

Mr. Wright applied for a position as a maintenance technician at Mt. Laurel Crossing Apartments—one of Lincoln's residential communities in Mt. Laurel, New Jersey—on May 28, 2013. Nancy Mossman, Lincoln's Business Manager at Mt. Laurel Crossing Apartments, and William Bennet, Lincoln's Lead Service Technician at the complex, interviewed him for the position. Ms. Mossman and Mr. Bennet testified that the job for which Mr. Wright was interviewed was for upgrading apartments and providing other service technician roles, including being "on-call" during nights and weekends and assisting in after-hours emergencies.

When Mr. Wright signed the application, he acknowledged that "any subsequent offer will be contingent upon the satisfactory completion of a more extensive background check occurring post offer," and authorized Lincoln to conduct further investigation including a post-offer drug screen, criminal background check, and credit check. Lincoln gave Mr. Wright a conditional offer of employment shortly after his interview, contingent on the results of a criminal background report and drug screen.

Jennifer Clatterbuck, Lincoln's Regional Payroll Coordinator, ordered a criminal background check concerning Mr. Wright on June 5, 2013. Lincoln enlisted First Advantage (f/k/a LexisNexis Screening Solutions, Inc.)[1] to provide a background check on Mr. Wright. Records from First Advantage show that on July 6, 2013 ("the June 6th report"), it sent (1) a cover letter, (2) an in-progress or partial copy of the June 5, 2013 report, and (3) a summary of rights under the FCRA to Mr. Wright. The June 6th report showed that Mr. Wright had been found guilty of a misdemeanor for driving under the influence in October 2008, and that he had been found guilty of

---

[1] Lincoln explains in its motion that First Advantage acquired LexisNexis Screening Solutions, Inc. in March 2013. While some documents in the record indicate that they were issued by LexisNexis and some by First Advantage, for clarity, the Court will refer to the entity solely as First Advantage.

2

two drug-related felonies in February 2001.  Mr. Wright testified that he was convicted of selling crack cocaine, and he pled guilty to possession and conspiracy.

The record includes another background report on Mr. Wright, which was issued by First Advantage on June 13, 2013 ("the June 13th report").  That report shows that while it was ordered on June 5, 2013, it was most recently updated on June 13th.  The June 13th report is more comprehensive than the June 6th report, but it included the same substantive criminal information.

Ms. Clatterbuck typically receives only one criminal background report for each applicant and testified that if an applicant's report contains criminal history, she sends an email with an attachment of the problematic sections of the report and types into the email the same information from the report.  On June 14, 2013, Ms. Clatterbuck emailed a copy of Mr. Wright's criminal background report to Ms. Mossman and William Biles, Lincoln's Regional Property Manager.  Mr. Biles testified that he was the one who made the decision not to hire Mr. Wright.  Ms. Mossman notified Mr. Wright that he would not have a position at Lincoln on or about June 19, 2013.

## II. Standard of Review[2]

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed R. Civ. P. 56(c).  An issue of fact is "genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual dispute is "material" if it might affect the outcome of the case under governing law.  *Id.*

---

[2] This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1332(a).

In evaluating a summary judgment motion, the court "must view the facts in the light most favorable to the non-moving party" and make every reasonable inference in that party's favor. *Hugh v. Butler Cty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005). A party seeking summary judgment bears the initial responsibility of informing the district court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial burden may be met by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." *Id.* at 325. Once the moving party has met its initial burden, "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Specifically, the non-moving party must raise more than "some metaphysical doubt" as to a material fact. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Summary judgment is proper if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

### III. Discussion

#### A. FCRA

Both parties move for summary judgment as to Mr. Wright's FCRA claim. Mr. Wright alleges that Lincoln violated the FCRA "by taking adverse employment action against [him] based on a consumer report, without first providing [him] with a copy of the pertinent consumer report and a written description of his rights under the FCRA" and by failing to provide Mr.

Wright with pre-adverse action notice before taking adverse action against him.  Compl. ¶ 22–23.

The FCRA is "undeniably a remedial statute that must be read in a liberal manner in order to effectuate the congressional intent underlying it." *Cortez v. Trans Union*, LLC, 617 F.3d 688, 722 (3d Cir. 2010).  It is assumed, and Lincoln does not dispute, that Lincoln is a person under the Act, 15 U.S.C. § 1681a(b), and Mr. Wright is a consumer, § 1681a(c).  First Advantage is a consumer reporting agency under § 1681a(f), and a criminal background report is considered a "consumer report," § 1681a(d).  There is also no dispute over whether Mr. Wright authorized Lincoln to run the report.  *Kelchner v. Sycamore Manor Health Ctr.*, 135 F. App'x 499, 502 (3d Cir. 2005) ("The requirement that an employer obtain authorization at any time before the report is procured is unambiguous." (internal quotation marks omitted)).

Mr. Wright asserts that Lincoln violated 15 U.S.C. § 1681b(b)(3)(A), which states in relevant part:

> [I]n using a consumer report for employment purposes, before taking any adverse action based in whole or in part on the report, the person intending to take such adverse action shall provide to the consumer to whom the report relates—
>
> (i) a copy of the report; and
> (ii) a description in writing of the rights of the consumer under this subchapter . . .

The notice requirement contained in § 1681b(b)(3) is referred to as a "pre-adverse action notice" and was intended "to afford employees time to discuss reports with employers or otherwise respond before adverse action is taken." *Goode v. LexisNexis Risk & Info. Analytics Grp., Inc.*, 848 F. Supp. 2d 532, 537 (E.D. Pa. 2012); *see also Ramos v. Genesis Healthcare, LLC*, 141 F. Supp. 3d 341, 347 (E.D. Pa. 2015), *appeal dismissed* (July 20, 2016) ("The purpose [of the pre-adverse action requirement] is to provide individuals an opportunity to contest inaccurate

5

information and to avoid an adverse decision by a potential employer based on erroneous information."). The FCRA requires that an employer "provide job applicants with their background report, summary of rights, and a 'real opportunity' to contest the contents of the background report before the employer relies on the report to take an adverse action against the applicant." *Moore v. Rite Aid Hdqtrs Corp.*, No. CIV.A. 13-1515, 2015 WL 3444227, at *4 (E.D. Pa. May 29, 2015).

While the FCRA is silent as to the precise amount of time an employer must provide an applicant to allow him to contest a report prior to taking adverse action, Congress has been clear that "[t]he employer must . . . provide the consumer with a reasonable period to respond to any information in the report that the consumer disputes and with written notice of the opportunity and time period to respond." H.R. REP. 103-486. Congress focused on a five day possible floor; eight days has been deemed a "reasonable period." *See Reardon v. ClosetMaid Corp.*, No. 2:08-CV-01730, 2013 WL 6231606, at *13 (W.D. Pa. Dec. 2, 2013).

The record contains two versions of Mr. Wright's background report: (1) the partial report sent on June 6th and (2) the June 13th report. The June 6, 2013 package included a cover letter stating that "[t]he results [of the search] are not an indication of an acceptance or a rejection of your employment or service. A separate letter may be forthcoming from the organization that requested your report to indicate acceptance or rejection." Ex. 1 to Sampler Aff. It also included what appears to be a partial copy of Mr. Wright's history, which contained his criminal background, and a document titled "A Summary of Your Rights Under the Fair Credit Reporting Act." It is undisputed that Lincoln *did not* send the report dated June 13th to Mr. Wright.

6

Lincoln argues that Mr. Wright cannot establish his claim under § 1681b(b)(3)(A) because the record shows that on June 6, 2013, a copy of Mr. Wright's in-progress criminal background report and a summary of rights under the FCRA was sent to the address where Mr. Wright lived and received mail at the time he applied for employment with Lincoln. Lincoln takes the position that it need not show that Mr. Wright actually read or received the notice and that mailing was sufficient. Lincoln argues in the alternative that even if it had failed to timely provide Mr. Write with a pre-adverse action notice, Mr. Wright cannot recover because the convictions that formed the basis of Lincoln's revocation were not erroneous and, in fact, Mr. Wright admitted to them.[3]

Nonetheless, Mr. Wright contends that the June 6th report suffers two problems: (1) Mr. Wright states he never received it, and (2) it does not satisfy the obligations under the FCRA because it does not contain the required information, including a summary of rights and advance notice of Lincoln's intention to withdraw its job offer based on the report. Further, he argues that Lincoln relied on the June 13th report, not the June 6th report, when making its decision to revoke its offer of employment, and consequently, sending the June 6th report does not satisfy Lincoln's obligations under the FCRA.[4]

---

[3] Lincoln provided no authority to support its argument that the accuracy of the criminal background precludes Mr. Wright's recovery for an FCRA violation. In essence, Lincoln implies there is no injury because Mr. Wright would not have been hired regardless of whether he received the complete report, and thus Lincoln seems to cursorily raise a standing challenge. This Court recently held, with respect to a different FCRA claim, that "inaccurate or incomplete disclosure" of a credit reporting agency's sources had been elevated to the status of a legally cognizable injury. *Stokes v. Realpage, Inc.*, No. CV 15-1520, 2016 WL 6095810, at *7 (E.D. Pa. Oct. 19, 2016). The Eastern District of Virginia similarly concluded that plaintiffs alleging pre-adverse action notice violations had standing. *See Thomas v. FTS USA, LLC*, No. 3:13-CV-825, 2016 WL 3653878, at *12 (E.D. Va. June 30, 2016) (holding that adverse action plaintiffs had properly alleged (1) informational injury by alleging that defendants took adverse action without providing information guaranteed by the statute, and (2) concrete injury, by alleging that they were deprived of the opportunity to "be confronted with the charges against them and tell their side of the story" (alterations omitted)). The Court sees no principled reason to conclude here that the accuracy of Mr. Wright's report is dispositive with respect to his FCRA claim.

[4] Apart from the substantive disagreement over whether the June 6th report satisfies the FCRA, Mr. Wright argues that Lincoln "sandbagged" him with a new witness and affidavit that the Court should disregard. In support

The Court is not persuaded by Mr. Wright's argument that failure to *receive* the June 6th report supports a FCRA violation.[5]  Nothing in the plain text of § 1681b(b)(3)(A) requires entities relying on background checks to ensure that the consumer to whom the report relates actually received the notice.  The statute simply states that the entity intending to take adverse action against an employee "shall provide" a copy of the report to the consumer to whom the report relates.  There is nothing in the statute, and Mr. Wright does not point to any case law, establishing a requirement that the entity intending to take adverse action take measures to ensure receipt.[6]  The record shows that a version of the background report was sent to Mr. Wright prior to Lincoln's decision to revoke its offer of employment.  Given the record, a reasonable jury could conclude that Lincoln "provided" a version of Mr. Wright's background report according to the statute.  The question then becomes whether the June 6th report satisfied the provisions of the FCRA.

The June 6th report appears to be an in-progress version of the background check, not the final version of Mr. Wright's report.  The FCRA "requires that an employer provide . . . the information given to it by the consumer reporting agency." *Moore v. Rite Aid Hdqtrs Corp.*, 33

---

of its motion for summary judgment, Lincoln attached an affidavit from Kevin Sampler, a Lincoln employee.  In the affidavit, Mr. Sampler authenticates the June 6th report and states that the report was sent to Mr. Wright.  Mr. Wright states that Lincoln did not identify Mr. Sampler as a witness during discovery and its failure to do so was not substantially justified or harmless.  However, the Court retains broad discretion to determine whether failure to disclose was harmless and if exclusion or sanctions are warranted.  *See Newman v. GHS Osteopathic, Inc., Parkview Hosp. Div.*, 60 F.3d 153, 156 (3d Cir. 1995).  Seeing as Mr. Stamper's affidavit simply authenticates and contextualizes documents that were produced during discovery, together with the obvious claim by Lincoln from the inception of this case that the June 6th communication was provided to Mr. Wright, the Court will not exclude it.

[5] Likewise, the Court rejects the argument that the June 6th report did not attach a summary of rights.  While it may be unclear whether Mr. Wright actually received the report, the record demonstrates that what First Advantage sent to Mr. Wright included a summary of rights under the FCRA.

[6] Lincoln looks to *Brown v. Lowe's Companies, Inc.*, 52 F. Supp. 3d 749, 756 (W.D.N.C. 2014), for the proposition that the FCRA "merely requires that notice is given before an adverse action is taken against them by the potential employer."  The *Brown* court did not opine on whether employers need to ensure receipt.  Rather, it addressed whether reports were sent to employees in a timely manner since many of the plaintiffs had not received copies of the report until after the employer's adverse action took place, if at all.  *See id.*  In any event, Mr. Wright was fully aware that a report may be forthcoming.  And, from the perspective of Lincoln, it has taken the position that it took steps to "provide: a copy of the report to Mr. Wright.

F. Supp. 3d 569, 576 (E.D. Pa. 2014). In *Moore*, the plaintiff alleged that the employer had failed to provide her with a complete copy of her background report, in violation of § 1681b(b)(3)(A), because the report she received did not include a voluntary admission statement that the agency conducting the background report had collected. The court concluded that the plaintiff failed to state a claim upon which relief could be granted because the employer also had not been given a copy of the voluntary admission statement. *Id.* The court in *Moore* reasoned that if the employer did not have access to certain information when it made its employment decision, the prospective hire need not have the opportunity to review it. *Id.* To satisfy its obligations under the FCRA, an employer need only disclose that background report information it was provided. The underlying assumption in *Moore* was that, under the FCRA an employer was required to turn over all of the information upon which it relied to the prospective employee. By extension, failure to provide complete information may constitute a violation.

The parties do not point to any authority stating that sending a copy of an in-progress background check, of which the employer may or may not have received a copy, prior to an adverse employment action satisfies the provisions of the FCRA. The record demonstrates that Lincoln decided to revoke Mr. Wright's offer of employment based on his February 2001 felony convictions. There are no material differences between the criminal history included in the June 6th report and the June 13th report. However, the June 13th report contains a more thorough summary of other types of searches run by the First Advantage, such as a credit report.[7] While

---

[7] It appears from the June 13th report that First Advantage ran searches on numerous databases to gather information about Mr. Wright. Mr. Wright's felony convictions appeared in the search of the First Advantage National Criminal File and the Montgomery County Court of Common Pleas Criminal Records. There is a note in the Source History for the Montgomery County Court of Common Pleas that the search was "in progress" on June 5, 2013 at 3:22 p.m., required additional research as of June 11, 2013, and was expected to be completed by June 12, 2013. The cover sheet for the report shows that it was completed at June 13, 2013. The June 6th report shows that the criminal background report begun on June 5, 2013 was sent to Mr. Wright at approximately 7:30 p.m. on June 6, 2013, and it contained Mr. Wright's criminal convictions as they appeared in the LexisNexis Criminal File Search.

Lincoln may have decided conclusively to revoke the offer of employment based on Mr. Wright's felony convictions, Mr. Wright remained unable to contest the full information upon which Lincoln relied even if he indeed received the June 6th transmittal, given that it only included his criminal history.

Although not precisely what occurred in this case, courts have previously addressed situations where a background report agency made an intermediate adjudication on an employee, or sent an intermediate report or notice to an employee, prior to the employer making a final determination. *See, e.g.*, *Ramos*, 141 F. Supp. 3d at 348 (holding that an internal decision to take an adverse action does not trigger § 1681b(b)(3)(A)); *Obabueki v. Int'l Bus. Machines Corp.*, 145 F. Supp. 2d 371 (S.D.N.Y. 2001), *aff'd,* 319 F.3d 87 (2d Cir. 2003) (holding that an internal decision to revoke an employment offer is not an adverse action, and an employer was not required to send a pre-adverse action notice before making such a decision); *Costa v. Family Dollar Stores of Virginia, Inc.*, No. 3:14-CV-00731-JAG, 2016 WL 3919458, at *4 (E.D. Va. July 19, 2016) ("The adverse effect does not come until [the employer] denies the application through the Second Letter . . . or fires the employee"); *but c.f. Moore v. Rite Aid Hdqtrs Corp.*, No. CIV.A. 13-1515, 2015 WL 3444227, at *4 (E.D. Pa. May 29, 2015) (concluding that the plaintiff had sufficiently pleaded a § 1681b(b)(3)(A) violation by alleging, *inter alia*, that the defendant took an adverse action without notification when it automatically removed an applicant from the "hire" track upon receiving a recommendation from the background report preparer); *Goode*, 848 F. Supp. 2d at 538 (holding that the adjudication of employees as "noncompetitive" by the background report preparer constituted an adverse action that triggered the FCRA's pre-adverse action notice requirement); *Manuel v. Wells Fargo Bank, Nat. Ass'n*,

---

While the searches in the two reports may be redundant and the reports appear to be materially the same with respect to criminal history, there is indication that the June 13th report required "additional research."

123 F. Supp. 3d 810, 823 (E.D. Va. 2015) (holding that a reasonable jury could conclude that an employer's hiring decision was a final adverse action under the FCRA when the employer made no effort to review or alter the reporting agency's recommended decision).

In these cases, the employer typically sought a background report from a third party provider, and the third party provider, whether midway through the check or at its conclusion, flagged problematic information or made a recommendation to the employer. The evaluation processes in *Goode* and *Ramos* provide helpful comparators. In *Ramos*, shortly after the employer's human resources representative requested the plaintiff's background report, the third-party provider notified the employer that the plaintiff had convictions that were relevant to the position she sought. The employer instructed the agency to continue its search, and the plaintiff was not notified of the initial flag. Once the employer received the full report from the agency, the employer discussed the report and disqualified her from employment. The employer then sent the plaintiff a letter notifying her that it was in the process of reviewing her application, enclosed the complete report, and told her she could contest any information. The plaintiff admitted to the conviction, but contested the level of the charge, and discussed it with her employer. Following extensive discussions between plaintiff and the employer, the employer revoked her employment offer. The court concluded that the defendant's pre-adverse action notice complied with the FCRA. *Ramos*, 141 F. Supp. 3d at 349.

In *Goode*, the court examined a background report preparer's practices. Its practice was, after a member requests information about a potential employee, to search its system and adjudicate the employee as competitive or noncompetitive based on a scoring system developed by the reporting agency and the employer. Following the adjudication, the agency sent pre-adverse action notices letters on member employer's letterhead to potential employees. Several

11

days later, it sent a final letter to potential employees. The court concluded that in this case, "there was no real opportunity for plaintiffs to contest the adjudication or change the outcome. Th[e] scheme is missing the crucial last step . . . where the employer makes a final decision based on both the report and any information the employee used to contest the report." *Goode*, 484 F. Supp 2d at 540.[8]

This case does not fall cleanly into the types of scenarios addressed by prior case law. As in *Ramos* and *Goode*, the preparer here, First Advantage, sent a pre-adverse action notification. In *Ramos*, however, the employer called the plaintiff and explained that it had "flagged" her for review a few days after the reporting agency sent a letter to the plaintiff. *Id.* at 345. Conversation and an email exchange between the plaintiff and the employer about the disputed conviction followed. No similar exchanges occurred here.

While there is no evidence on the record that First Advantage made an internal adjudication, the process described in *Goode* (and *Costa*) more closely resembles what took place here. *Goode*, 848 F. Supp. 2d at 540 (E.D. Pa. 2012) ("[D]efendant's system undermines the goal of § 1681b(b)(3)(A)"). First Advantage sent Mr. Wright an initial notice, a short period of time passed, and Lincoln communicated a final decision. The final decision was unaccompanied by a copy of the report, instructions for how to challenge the report, or a notice of rights. Indeed, here in this case, the final report upon which Lincoln relied was not sent to Mr.

---

[8] The Eastern District of Virginia addressed a similar situation in *Costa v. Family Dollar Stores of Virginia, Inc.*, No. 3:14-CV-00731-JAG, 2016 WL 3919458 (E.D. Va. July 19, 2016). The defendant enlisted First Advantage—evidently the same provider as here—to conduct background checks on applicants. First Advantage would assign a code to the applicant and for those who were coded as "not recommended," First Advantage sent a packet of information to the applicant containing, as here, (1) a letter informing the applicant that the background check "may adversely affect your employment status;" (2) a copy of the applicant's background check; and (3) a description of the applicant's rights under the FCRA. *Id.* at *1. If the applicant did not dispute the report within five days, First Advantage would send a second letter revoking the employment offer; if there is a dispute, Family Dollar reviewed the application. The Court concluded that the second letter is the adverse action and granted summary judgment for Family Dollar. While the process appears to be similar in *Costa*, the outcome is not binding on this Court.

Wright. Accordingly, given the record in this case at this time, it should be left to a jury to determine whether Lincoln complied with its responsibilities under the FCRA.

### B. CHRIA

Mr. Wright also alleges that Lincoln violated the Pennsylvania's Criminal History Record Information Act, 18 Pa. C. S. § 9101 *et seq.* ("CHRIA") by using on Mr. Wright's criminal history in an improper manner when it disqualified him for employment as a maintenance technician on the basis of his drug-related felony convictions. CHRIA limits the ways in which an employer may rely upon past criminal history in making employment decisions. *McCorkle v. Schenker Logistics, Inc.*, No. 1:13-CV-3077, 2014 WL 5020598, at *5 (M.D. Pa. Oct. 8, 2014). It provides, in relevant part:

> (a) General rule.—Whenever an employer is in receipt of information which is part of an employment applicant's criminal history record information file, it may use that information for the purpose of deciding whether or not to hire the applicant, only in accordance with this section.
> (b) Use of Information.—Felony and misdemeanor convictions may be considered by the employer only to the extent to which they relate to the applicant's suitability for employment in the position for which he has applied.
> (c) Notice.—The employer shall notify in writing the applicant if the decision not to hire the applicant is based in whole or in part on criminal history record information.

18 Pa. Stat. and Cons. Stat. § 9125. It "only applies when an employer denies an applicant employment because of his or her criminal history." *White v. PNC Bank*, No. CV 15-1345, 2016 WL 1404148, at *6 (E.D. Pa. Apr. 11, 2016).

Lincoln argues that CHRIA is inapplicable because the plain language of the statute states that it only applies to Pennsylvania residents who apply for jobs within the Commonwealth, and only applies to persons in the Commonwealth. The relevant provision provides:

13

> This chapter shall apply to persons within this Commonwealth and to any agency of the Commonwealth or its political subdivisions which collects, maintains, disseminates or receives criminal history record information.

18 Pa. Stat. and Cons. Stat. § 9103. Lincoln argues that it is not a "person" within the meaning of the statute because it is incorporated and has its principal place of business in Texas and Mr. Wright applied for a position in New Jersey. Mr. Wright notes that Mr. Biles, the regional property manager for Lincoln, oversaw properties in Pennsylvania and worked out of his home in Pennsylvania.[9]

There is a dearth of case law interpreting CHRIA, and the parties do not point to any authority explaining the contours of the statute's applicability beyond its plain language. While Lincoln may be considered a "person" in some respects due to its contacts with Pennsylvania, the Court has found no support for the contention that Pennsylvania's employment laws, or background check laws, should extend to employment taking place outside its borders. Indeed, other state employment laws have not been extended outside Pennsylvania, despite an employer having contacts to the Commonwealth. In *Denty v. SmithKline Beecham Corp.*, a plaintiff filed federal and state age discrimination claims against a British employer with a Philadelphia outpost following the employer's failure to promote him from the Philadelphia office to a position abroad. The Third Circuit Court of Appeals affirmed the district court's dismissal as to the state law claim because "no evidence exists to show the Pennsylvania legislature intended to apply the PHRA to employment decisions made by foreign corporations for positions located outside the United States." 109 F.3d 147, 151 n.7 (3d Cir. 1997) (affirming dismissal on federal and state law discrimination claims). The district court below had concluded that the relevant work site for determining applicable discrimination law was the location of the position the

---

[9] Mr. Wright argues that Mr. Biles "collects, maintains, disseminates or receives criminal history record information," but that phrase pertains to "any agency of the Commonwealth or its political subdivisions," not "persons" generally.

plaintiff had applied for, not the location of the plaintiff's employment at the time of the alleged discrimination.  *Id.* at 149.  Accordingly, the Court similarly concludes that the relevant location here was New Jersey—the location of the position—and therefore CHRIA does not apply.  Accordingly, Lincoln is entitled to summary judgment as to Plaintiff's CHRIA claim.

### C.  Punitive Damages[10]

The FCRA establishes two schemes for recovery: (1) if the violation is merely negligent, a plaintiff can recover actual damages, costs, and attorney's fees and (2) if a violation is willful, the statute imposes "liability for punitive and, potentially, statutory damages." *Dougherty v. Quicksius, LLC*, No. CV 15-6432, 2016 WL 3757056, at *3 (E.D. Pa. July 14, 2016).  To find willful noncompliance with the FCRA, a plaintiff must demonstrate that the defendant acted with "reckless disregard."  *Cortez v. Trans Union, LLC*, 617 F.3d 688, 721 (3d Cir. 2010); *accord Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 69 (2007).  The Third Circuit Court of Appeals explained that "to justify an award of punitive damages, a defendant's actions must be on the same order as willful concealments or misrepresentations."  *Cushman v. Trans Union Corp.*, 115 F.3d 220, 227 (3d Cir. 1997).  While the record at this stage does not conclusively support an award of punitive damages, the Court will hold for a later point in the litigation the question of whether to allow a jury to make that determination.

---

[10] Because the Court grants summary judgment for Lincoln on the CHRIA claim punitive damages are unavailable on that basis.

## IV. Conclusion

For the foregoing reasons, the Court will grant in part and deny in part Lincoln's motion for summary judgment and deny Mr. Wright's motion for summary judgment. An appropriate Order follows.

BY THE COURT:


<u>S/Gene E.K. Pratter</u>
GENE E.K. PRATTER
United States District Judge